NOT DESIGNATED FOR PUBLICATION

No. 122,913

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of T.D. and J.D.,
Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Opinion filed January 8, 2021. Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for appellant natural mother.

*Morgan L. Hall*, deputy district attorney, for appellee.

Before HILL, P.J., MALONE and BUSER, JJ.

PER CURIAM: Mother appeals the termination of her parental rights to her two children: T.D. and J.D. She argues that there was insufficient evidence to support the district court's finding she was unfit and that her unfitness was unlikely to change in the foreseeable future. Mother also asserts that the district court abused its discretion in finding that termination of parental rights was in the best interests of the children. For the reasons stated in this opinion, we affirm the district court's judgment.

FACTS AND PROCEDURAL BACKGROUND

On May 12, 2015, three-year-old T.D. and three-month-old J.D. were taken into police protective custody after an incident where J.D. was taken to the hospital in Topeka and it was discovered that he had a severely fractured left arm. Medical professionals

determined that the fracture was non-accidental and was likely sustained as the result of abuse or rough handling of the infant. The police suspected Father caused the injury to J.D. and later arrested him for aggravated battery and aggravated child endangerment.

According to the Department for Children and Families' (DCF) application for a child in need of care (CINC) petition, Mother and Father had been engaged in an ongoing domestic dispute in the days before May 12, 2015. Mother advised the DCF worker who filed the application, Ashley Lang, that she and Father argued on May 10 and that the argument lasted all day. Mother essentially ended her relationship with Father and told Father that he, Mother's cousin, and Mother's friend would babysit T.D. and J.D. while Mother went to Wichita for a few days to find new housing for her and the children.

Mother stated that while she was in Wichita, both her cousin and her friend tried contacting her multiple times about J.D. because he would not stop hysterically crying. Mother advised her friend to take J.D. to the hospital, and Mother returned to Topeka. When asked about who she believed caused J.D.'s injury, Mother told Lang that she expected Father to do something like this because Father had a history of being violent with their daughter, T.D. Mother then recounted previous incidents where Father was abusive toward T.D. and toward Mother. She explained that Father typically turned violent when he has been drinking or when he has been using methamphetamine. Mother also disclosed that Father was on probation at that time for child endangerment following an incident where Father became violent with Mother and T.D. She explained that the current incident with J.D. was the third time Father had been accused of child endangerment. Mother admitted to Lang that she ultimately regretted leaving T.D. and J.D. with Father and believed it was the wrong decision, but she explained she wanted a break from all the fighting with Father.

Mother also told Lang that she suffered from several mental health disorders, including borderline personality disorder, mood swings, attention-deficit disorder (ADD),

2

attention-deficit/hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), obsessive compulsive disorder (OCD), and explosive anger outbursts. Mother admitted to Lang that she was not taking any medication at that time because her doctor refused to give her the medication that Mother believed worked for her. Mother also disclosed that she had another child removed from her custody in 2008 after Mother had threatened a nurse.

Lang also spoke with Danielle Reyner, the social worker at the hospital, on May 12, 2015. Reyner informed Lang that she was familiar with Mother because of past involvement—specifically, there had been a report made when J.D. was born. Reyner expressed concerns that J.D. was behind on five immunizations and on his well child checks. Reyner also explained to Lang that she observed T.D. at the hospital while J.D. was being seen. Reyner noted that T.D. appeared "very filthy" and that she did not have any boundaries with strangers or staff. Reyner advised that she spoke with Mother about the incident. During that conversation, Mother told Reyner that her friend—one of the people Mother left the children with when Mother went to Wichita—used methamphetamine.

Lang also spoke with Ashley Bliss, the KVC family preservation worker who had been working with the family since February 2015. Bliss told Lang that Mother and Father had a strained relationship and there was a cycle of domestic issues between the two. Bliss explained that Father had a traumatic brain injury, which prevented him from being a primary caregiver to the children. She said Father did not really engage with family preservation services. Bliss also explained that Mother would be overwhelmed with providing care for T.D. and J.D., which is likely part of the reason Mother continued to have a relationship with Father. Bliss noted that Mother often would kick Father out of the house, file a protection from abuse (PFA) action against Father, rekindle her relationship with Father, and then drop the PFA action against him.

3

Based on this information, Lang concluded that there were ongoing domestic violence issues between Mother and Father and that Father had a history of violence toward Mother and T.D. While Mother would try to leave the situation, she would ultimately rekindle her relationship with Father. Mother also left the children in Father's care when she went to Wichita despite knowing Father's violent history with T.D. Lang was also concerned about Mother's unaddressed mental health issues, and she also believed that Mother's decision-making skills were not safe for the children despite help from KVC family preservation services. As a result, Lang recommended that T.D. and J.D. be placed in DCF custody.

*The CINC proceedings*

Based on this application, the State filed two CINC actions on May 14, 2015. That same day, the district court placed T.D. and J.D. in DCF custody. The children were ultimately placed in foster care with a family in Winfield. The court also ordered that Father was not to have contact with Mother or the children and that Mother would have regular visits with the children. The district court set the matter for a pretrial hearing on June 29, 2015, but that hearing was continued to August 10, 2015.

At the August 10 pretrial hearing, Mother entered a no contest statement as to the State's petitions. The district court set the matter for adjudication and disposition on October 6, 2015. At the adjudication and disposition hearing, Mother and her attorney appeared, and the court adjudicated T.D. and J.D. as CINC. It ordered the children would remain in DCF custody, it approved and adopted the proposed permanency plan, and it noted that all prior orders would remain in effect. The district court set the matter for a permanency hearing.

On April 25, 2016, the district court held a permanency hearing at which Mother appeared. The court noted that the permanency goal was a dual goal of reintegration or

adoption. It found that the agencies were making reasonable efforts to support the family, adequate progress was being made toward the permanency plan goals, reintegration continued to be viable, and the children could return home if they had a safe and stable environment. The district court set the matter out for another permanency hearing.

The next permanency hearing took place on March 13, 2017. Mother was present for the hearing. The district court once again noted in its journal entry that the permanency plan goal was a dual goal of reintegration and adoption. It found that the agencies were making reasonable efforts to help the family accomplish the permanency plan, adequate progress was being made toward the permanency plan goal, the children's needs were being adequately met, and that reintegration continued to be viable but that reintegration should not happen until the court ordered it. The court also ordered that venue be changed to Barton County as Mother had previously moved to Great Bend in June 2016 after her life had been threatened while living in the Topeka area. But the district court also scheduled the matter for a review hearing and a permanency hearing.

On August 21, 2017, the district court held a review hearing at which Mother appeared. As of that date, the Barton County District Court refused to assume venue, so the matter remained in Shawnee County. The court ordered that DCF provide Mother with a local case manager in Great Bend to help Mother complete her case plan tasks. Mother was also ordered to provide a hair test that same day. The court set the matter out for a permanency hearing.

Mother appeared by phone at the permanency hearing on February 5, 2018. Once again, the district court noted that the permanency goal was a dual goal of reintegration or adoption. The court also found that the agencies were making reasonable efforts to help the family accomplish the permanency plan, adequate progress was being made toward the permanency plan goal, the children's needs were being adequately met, and that reintegration continued to be viable but that reintegration should not happen until the

court ordered it. It also ordered that all parties must appear in person for future hearings and that KVC needed to provide Mother with reasonable assistance for transportation to and from visits. The court scheduled the case for a review hearing.

*Motion to terminate parental rights*

In its journal entry memorializing the June 11, 2018 review hearing, the district court ordered that the case be set for termination of parental rights. There is no explicit finding ordering the State to file a motion to terminate parental rights, but the State filed its motion on August 22, 2018, as to both parents. In its motion, the State asked the district court to find Mother and Father unfit to parent T.D. and J.D. under nine statutory factors:

- Emotional illness, mental illness, mental deficiency, or physical disability of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child (K.S.A. 2019 Supp. 38-2269[b][1]);
- Conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature (K.S.A. 2019 Supp. 38-2269[b][2]);
- Physical, mental, or emotional abuse or neglect or sexual abuse of a child (K.S.A. 2019 Supp. 38-2269[b][4]);
- Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (K.S.A. 2019 Supp. 38-2269[b][7]);
- Lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or condition to meet the needs of the child (K.S.A. 2019 Supp. 38-2269[b][8]);
- The child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in K.S.A. 2019 Supp. 38-2269(c) apply (K.S.A. 2019 Supp. 38-2269[b][9]);

6

- Failure to assure care of the child in the parental home when able to do so (K.S.A. 2019 Supp. 38-2269[c][1]);

- Failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child (K.S.A. 2019 Supp. 38-2269[c][2]); and

- Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home (K.S.A. 2019 Supp. 38-2269[c][3]).

As to Mother, the State alleged that as of the date of the motion, she failed to comply with the court-approved reintegration plan. The agencies made reasonable efforts to reunify the family but failed, and the State alleged that this condition was unlikely to change for the foreseeable future. Specifically, the State noted that Mother had not had any visits with T.D. and J.D. since July 2017 because the children's therapist recommended that visits no longer take place. Mother had not contacted KVC since January 2018. When KVC tried to contact her in March 2018, the phone number on file for Mother was no longer working.

The State also alleged that Mother failed to obtain and maintain safe, stable, and drug-free housing for the children and provided no documentation showing that she had done so. She also failed to provide KVC with proof of verifiable income. The State alleged that Mother failed to enroll in and complete an appropriate parenting class. It also noted Mother was taken off KVC's color code urinalysis system in September 2017 because Mother failed to show up for drug testing as required for several months. The State also explained that Mother failed to participate in individual or group therapy for domestic violence victims. While she previously attended therapy, Mother quit after she moved and refused to return. She also failed to provide KVC with any documentation that she reengaged with therapeutic services.

7

The State also alleged that Mother failed to complete and follow the recommendations of her psychological evaluation and parenting assessment as required. Based on this, the State argued that Mother's inability or unwillingness to cooperate with the agencies and her lack of progress in completing the case plan tasks demonstrated her inability to meet the needs of T.D. and J.D. in the foreseeable future. Because the children had been in out of home placement since May 2015, neither parent cooperated with the agencies, neither parent completed their case plan tasks, and the agencies' reasonable efforts to rehabilitate the family failed, the State argued that it was in the children's best interests to terminate Mother and Father's parental rights and proceed with adoption with the children's foster family.

At a pretrial hearing on September 25, 2018, the district court ordered the parties to appear at the final pretrial conference before the termination trial. It also ordered that the parties needed to have their witness and exhibit lists ready by that date. The court set the final pretrial conference for October 25, 2018.

At the final pretrial conference, Mother appeared but Father did not. The district court found Father to be in default as to the State's motion to terminate parental rights, but his default was held in abeyance pending Mother's termination trial. The court also ordered that Mother complete a hair test and set a motions hearing on December 10, 2018. The court ordered that Mother appear at that hearing. It also scheduled the termination trial for February 6, 2019, and ordered Mother to appear at the trial.

Mother failed to appear at the December 10, 2018 motion hearing, and the district court found her to be in default as to the State's motion to terminate parental rights. The court allowed Mother 14 days from the date of the hearing to file a motion to set aside the default judgment. Mother's attorney did so on December 18, 2018. In the motion, Mother's attorney explained that Mother's failure to appear was not Mother's fault. In fact, the attorney alleged that because no motions had been filed, he incorrectly informed

8

Mother that she did not need to appear. On January 6, 2019, the district court set aside the default order for the reasons stated in Mother's motion.

The district court held another permanency hearing on January 7, 2019. At this hearing, the court noted that the permanency plan goal changed to only adoption. It found that the agencies made reasonable efforts to help the family accomplish the permanency plan, adequate progress was being made toward the permanency plan goal, the children's needs were being adequately met, reintegration was no longer a viable option, and that adoption was in the children's best interests. The court once again ordered that the default judgment as to Mother be set aside, Mother must take a urinalysis test that same day, Mother must take a hair test by the end of the week, and it set the termination trial for February 6, 2019. But in its journal entry, the court noted it went back on the record because Mother refused to take the court-ordered urinalysis test. The court found Mother to be in contempt, and Mother was arrested. The court ordered Mother to be released on January 11, 2019, so that she could take the hair test and ordered Mother to appear in court on January 14, 2019. The court provided Mother with a custody slip showing that she had to appear in court on the January 14 date.

On January 14, 2019, Mother failed to appear in court as ordered. The district court once again found Mother in default as to the State's motion. The court sua sponte terminated Mother's parental rights and vacated the termination trial setting. Mother moved to set aside the default judgment on January 18, 2019. In the motion, Mother alleged that she has very poor eyesight because of several health-related issues and she did not see the court date on the custody slip. She claimed she did not intentionally miss the hearing. The district court denied Mother's motion on March 1, 2019, finding Mother's argument was unpersuasive. Specifically, it noted that Mother had previously failed to appear for scheduled hearings; she acted erratically at the previous hearing, warranting a urinalysis; she refused to submit to the test and was held in contempt; she had tested positive for illegal substances several times throughout the case; the custody

9

slip clearly stated the date she was to appear; and both she and her attorney were given verbal notice of the hearing. The district court also found that the children would be prejudiced in setting aside the default judgment because the case had been going on for four years by that point and Mother kept unnecessarily lengthening the proceedings.

The district court held a hearing on the State's motion to terminate parental rights on March 1, 2019. Mother did not appear, although Mother's attorney was present. The State proffered its motion, and the district court found both parents to be unfit pursuant to all the statutory factors listed in the State's motion. It also found that this condition was unlikely to change for the foreseeable future. The court terminated Mother and Father's parental rights after finding that such a decision was in the children's best interests. In terminating Mother's parental rights, the court specifically relied on Mother's default judgment and it reaffirmed that judgment in its journal entry. It also reaffirmed adoption as the permanency plan goal and ordered that adoption proceedings be initiated.

On August 5, 2019, the parties executed an agreed order setting aside the judgment terminating Mother's parental rights. The district court set the judgment aside because of recent caselaw addressing default judgments in CINC cases. The district court rescheduled the case for a final pretrial conference on the State's motion to terminate Mother's parental rights.

On December 9, 2019, the district court held another permanency hearing. It noted that adoption was still the only permanency plan goal. The court found that the agencies made reasonable efforts to help the family accomplish the permanency plan, adequate progress was being made toward the permanency plan goal, the children's needs were being adequately met, reintegration was no longer a viable option, and that adoption was in the children's best interests. It set the termination trial for January 8 and 9, 2020. But the trial was continued to February 12, 2020, as Mother was in the hospital.

10

The termination trial began on February 12, 2020, and it lasted for two-and-a-half days. The State called several witnesses and presented evidence supporting its motion to terminate Mother's parental rights. At the close of the State's case, Mother testified on her own behalf. The testimony and the evidence at the hearing will be detailed below.

On February 14, 2020, the district court issued its ruling. First, the court commended Mother for recognizing that her children were doing well in foster care and that the case was not about whether Mother loved her children. Rather, the case was about whether Mother could take care of T.D. and J.D. The court then found there was clear and convincing evidence establishing that Mother was unfit under the factors listed in the State's motion, but also it found Mother to be unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(3) because of her continued drug use and how drug use affected Mother's ability to parent T.D. and J.D.

The district court also found clear and convincing evidence establishing that Mother's unfitness was unlikely to change for the foreseeable future. In so finding, the court pointed to four specific things: (1) Mother seemed to have continuous trauma and drama impacting her life, and it impacted her ability to parent because it established a lack of stability; (2) Mother consistently failed to find and maintain stable housing, having lived in at least seven places in the five years the case had been ongoing; (3) Mother's continual drug use; and (4) Mother's mental health issues that she consistently failed to address over the life of the case. The district court ultimately found it was in the children's best interests to terminate Mother's parental rights because the children needed stability and permanency and according to the children's therapist, it would be traumatic for the children to be removed from their foster care placement to return to Mother's care. The court memorialized its findings in a journal entry dated February 20, 2020. Mother timely appealed the district court's ruling.

11

K.S.A. 2019 Supp. 38-2269(a) provides that a district court may terminate parental rights if it finds by clear and convincing evidence the parent is unfit by reason of conduct or condition which renders the parent unable to properly care for a child and that the parent's unfitness is unlikely to change in the foreseeable future. When reviewing these kinds of determinations, appellate courts must consider whether, after reviewing all the evidence in a light most favorable to the State, it is convinced a rational fact-finder could have found it highly probable that the parent's rights should be terminated. Appellate courts do not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact when reviewing these determinations. *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

*Statutory findings on parental unfitness*

On appeal, Mother challenges the district court's ruling that she is unfit to parent T.D. and J.D. and that her unfitness is unlikely to change in the foreseeable future. Specifically, she argues there is insufficient evidence to support the statutory factors the court relied on in finding that Mother was unfit and that her unfitness was unlikely to change in the foreseeable future.

K.S.A. 2019 Supp. 38-2269(a) provides that a district court may terminate parental rights after a child has been adjudicated a CINC. The statute lists nonexclusive factors the court shall consider in making an unfitness determination. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when, as here, a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may, but do not necessarily, establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f).

Here, the district court cited 10 factors in K.S.A. 2019 Supp. 38-2269(b) and (c) in making its findings on unfitness. Mother challenges each of these factors. Thus, we will analyze each factor below in turn.

### 1. *K.S.A. 2019 Supp. 38-2269(b)(1).*

A district court may find a parent unfit if there is clear and convincing evidence that the parent suffers from an emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render that parent unable to care for the ongoing physical, mental, and emotional needs of his or her child. K.S.A. 2019 Supp. 38-2269(b)(1).

The district court found Mother suffered from mental health issues that rendered her unable to care for the children. It noted that evidence of this was "laid out throughout" the case. Specifically, the court pointed to testimony from Dr. Stephen Hazel, the individual who conducted Mother's psychological evaluation and parenting assessment, and Mother's recognition of her mental illness and its impact on her ability to care for the children to support its finding.

Mother notes that when the case began in May 2015, KVC identified Mother's mental health as an area of concern. But she argues that KVC did not set up a psychological evaluation for her until August 2017. Mother argues that Dr. Hazel found that her mental health issues were not a major concern, that she could understand her current situation and actions, and that she cared about and wanted to parent her children. In fact, she asserts that her mental illness helps her better understand the mental health issues T.D. has, which motivated Mother to push for therapeutic visits with T.D. so that she could better support T.D. Mother argues this is proof that her mental health issues did not render her unfit to parent T.D. and J.D.

13

But there is clear and convincing evidence to support the district court's finding as to this factor. Lang, the DCF worker who investigated the abuse claim, testified for the State at the termination trial. She explained that in May 2015, Mother disclosed to Lang that Mother suffered from borderline personality disorder, mood swings, ADD, ADHD, PTSD, OCD, and explosive anger outbursts. Mother admitted to Lang that she was not taking any medication at that time because her doctor refused to give her the medication that Mother believed worked for her. Mother also disclosed that she had another child removed from her custody in 2008 due to Mother's mental health issues. Lang was concerned about the children's safety because Mother was not taking any medication and because she was not receiving any mental health services for her conditions. On cross-examination by the guardian ad litem (GAL), Lang explained that before the 2008 case involving Mother's other child, Mother had been admitted to Larned State Hospital four times because of her mental health concerns.

Because of these concerns, KVC required Mother to complete the following case plan tasks: finish a mental health assessment; follow the assessment's recommendations, which included a recommendation to attend therapy; provide proof of the assessment to KVC; participate in a psychological evaluation and parenting assessment; and attend individual or group therapy for domestic violence victims. Mother reported to Ashley Leesman, the KVC case manager from late 2016 to May 2017, that she completed her mental health assessment but was waiting on documentation for it. She also reported that one recommendation of the assessment was to attend individual therapy. Leesman testified at the termination trial that she never received proof that Mother completed the assessment or that Mother was attending individual therapy.

Several former KVC case managers and permanency supervisors testified at the termination trial that Mother failed to address her mental illness throughout the pendency of the case. She consistently failed to attend therapy to address her own issues and to address her domestic violence trauma. At one point, after she moved to Great Bend,

14

Mother started attending therapy, but once she left Great Bend, she stopped going and refused to go back. There were also times where Mother reported to KVC that she had scheduled or attended therapy but then failed to provide proof to KVC as required. Mother even testified at the termination trial that she only did therapy "as needed" after she moved away from Great Bend, despite also testifying that she had been suicidal as a result of being unable to process and cope with her past trauma. At one point during Mother's testimony, the court became so concerned with Mother's admission that she had been suicidal and that she did not know how to feel about anything anymore that the court called the attorneys aside to ensure Mother would be safe following the trial.

As to the psychological evaluation and parenting assessment, Dr. Hazel testified at the termination trial that he did not believe he gathered enough information to complete his assessment. But he stated he could gather enough information to compile a report and make some recommendations based on what he had. Mother was supposed to have three sessions with Dr. Hazel:  one in August 2017, one in September 2017, and one in November 2017. But five appointments were ultimately scheduled because Mother failed to show for two of the appointments. During the November appointment, Mother became so upset that she left the appointment early.

Dr. Hazel testified that based on his interactions with Mother, he had several concerns about her. He noted that Mother refused to recognize that Father likely harmed J.D. He wondered about Mother's instability—the fact that she never had a stable living situation and that she was emotionally unstable. Dr. Hazel was also concerned about Mother's parenting ability in that she could not recognize where the children were developmentally. He also testified that Mother's judgment and decision-making skills were problematic. This is because she did not want to see her role in certain situations— e.g., her involvement in why the children were removed from her care—and she blamed others for those situations. Dr. Hazel testified that Mother had certain responsibilities she needed to live up to and she needed to change to do so. He also stated Mother's

15

psychological issues needed to be addressed. Mother suffered from past trauma and abuse and she had anger issues stemming from that trauma. The doctor noted that her anger made it difficult for Mother to function in a stable manner. For example, she would often say during the assessment process that KVC staff was working against her and that people were out to hurt her in some way. In other words, Dr. Hazel reported that Mother's anger issues made her suspicious and hindered her ability to interact with professionals working in the case because she saw them as constantly working against her.

Dr. Hazel testified that Mother would need to engage in certain services to address her mental health issues, including attending therapy, attending anger management, attending domestic violence therapy, and establishing a medication regimen. He also recommended that Mother complete all tasks required by KVC. While Dr. Hazel was reluctant to state that it was in the children's best interests that Mother's parental rights be terminated—he believed this decision was the court's to make—he ultimately concluded that Mother had not addressed the risk factors he identified during the assessment.

There was more than sufficient evidence presented that Mother's mental health and emotional issues impeded her ability to care for T.D. and J.D. As such, the district court correctly found that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(1).

*2. K.S.A. 2019 Supp. 38-2269(b)(2).*

A district court may find a parent unfit if there is clear and convincing evidence that the parent acted in a physically, emotionally, or sexually cruel or abusive way toward his or her child. K.S.A. 2019 Supp. 38-2269(b)(2).

The district court's finding on this point was merely conclusory. It did not expound further aside from making this statutory finding. Mother argues there was insufficient evidence to support this finding. She argues that the only evidence the State produced as

16

to this factor was that Mother failed to protect T.D. and J.D. from Father's abuse at the inception of the case. She asserts that because there was no other issue like this throughout the life of the case, the district court erred in making this finding.

But contrary to Mother's assertion, there was clear and convincing evidence to support the district court's finding as to this factor. As Mother correctly notes in her brief, a parent's failure to protect his or her child from abuse constitutes abusive conduct under K.S.A. 2019 Supp. 38-2269(b)(2). *In re S.D.*, 41 Kan. App. 2d 780, 789, 204 P.3d 1182 (2009). Mother concedes that in May 2015, she left the children with Father despite knowing about Father's violent history toward T.D. Besides leaving the children with Father, Mother also asked her friend and her cousin to help Father care for the children. Mother reported that her friend used methamphetamine, and at the termination trial, Mother testified that her cousin later failed a background check ordered by KVC and that KVC workers were afraid of her cousin.

But what is most telling is the fact that Mother refused to recognize during her psychological evaluation with Dr. Hazel that Father likely caused J.D.'s injury. This is a strong indicator that even in late 2017, Mother still did not believe that her actions in May 2015 constituted abusive conduct under K.S.A. 2019 Supp. 38-2269(b)(2).

When viewed in a light most favorable to the State, there was clear and convincing evidence establishing that Mother acted in an abusive manner toward T.D. and J.D. This evidence was largely unchallenged. Thus, the district court correctly found that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(2).

### 3.  *K.S.A. 2019 Supp. 38-2269(b)(3).*

A district court may find a parent unfit if there is clear and convincing evidence that a parent's use of intoxicating liquors or narcotics or dangerous drugs is of such

17

duration or nature as to render the parent unable to care for the child's ongoing physical, mental, or emotional needs. K.S.A. 2019 Supp. 38-2269(b)(3).

Notably, the State did not request that the district court find Mother unfit as to this factor in its motion to terminate parental rights. But the court found Mother unfit as to this factor anyway. Specifically, the court noted that Mother had a history of drug use between 2015 and 2019 as identified in the court reports that were introduced at trial. While these reports and the social file were not included in the record, several of the State's witnesses testified about reports they authored at trial. The court found that Mother's substance abuse issues "got in the way of parenting."

Mother argues that while there was evidence that she had a substance abuse issue, the State failed to prove that her drug use caused her to inadequately care for T.D. and J.D. In other words, the State did not point to any direct evidence that her drug use harmed her ability to parent the children. But Mother fails to acknowledge that direct evidence of her drug use is unnecessary. As this court previously recognized:

> "Any material fact may be proven not only by direct testimony, but also by indirect or circumstantial evidence, or by a combination of both. The State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration. Similarly, the State need not provide direct evidence that a parent's drug use is in and of itself harmful to a child where clear and convincing evidence shows that the parent's failure to acknowledge his drug issues creates a significant impediment towards reintegration. [Citations omitted.]" *In re M.S.*, 56 Kan. App. 2d 1247, 1258-59, 447 P.3d 994 (2019).

While there may not be direct evidence that Mother's drug use was itself harmful to T.D. and J.D., there is clear and convincing evidence that her failure to acknowledge these issues created a significant impediment towards reintegration. Leesman, one of the early KVC case managers, testified at trial about a court report she authored for the

18

March 13, 2017 permanency hearing. This report was entered into evidence but is not provided as part of the record. Leesman explained that this report stemmed from information she gathered while Mother still lived in the Topeka area and before she moved to Great Bend. In that report, Leesman noted that one of Mother's case plan tasks was to complete urinalysis tests as directed by KVC. For the entire time Leesman worked on the case, she testified that Mother never submitted to a urinalysis test. This is significant because before Mother could attend visits with the children, she had to submit to a urinalysis and test negative.

Nicki Unfred, the KVC permanency supervisor on the case from the end of 2016 through the end of 2017, also testified at trial for the State. Unfred prepared a court report for the August 21, 2017 review hearing, and she testified about the concerns she noted in that report. This report was not included in the record, but it was introduced as evidence at the trial. In that report, Unfred noted that Mother was using drugs often and that there was a concern about Mother's ability to reintegrate with the children based on her substance abuse. Mother often refused to submit to urinalysis tests and would make excuses as to why she could not do so. When Mother did participate in a urinalysis test on July 11, 2017, she tested positive for methamphetamine. This test result was significant because Mother was supposed to visit with the children on July 11. T.D. and J.D. had been transported from southern Kansas to Topeka to attend that visit, and when Mother tested positive, she was not allowed to have her visit. The children were transported back to southern Kansas without seeing Mother. Following the July 11 visit, KVC imposed a new condition requiring Mother to come to Topeka early enough to complete a urinalysis before the children were transported for their visit. Unfred could not remember if Mother ever complied with this requirement.

Austin Solis, the KVC case manager from July 2017 to May 2018, also testified at trial about court reports he authored while on the case. He authored a report dated September 11, 2017. This report was not included in the record, but it was introduced into

19

evidence at trial. Solis testified that in this report, he included information about Mother's canceled visit with the children on July 11, 2017, due to her positive urinalysis test. After that positive test, Solis required Mother to complete a drug and alcohol assessment. That assessment recommended that Mother seek mental health services, but as noted above, Mother failed to do so. Solis testified that he also set up urinalysis services for Mother while she lived in Great Bend, but he could not recall whether she ever followed through with those tests. He reported that Mother would also refuse to do hair testing when directed. However, on August 21, 2017, Mother submitted to a hair test and tested positive for methamphetamine once again. Solis had concerns about Mother's drug use, among other things, and recommended in his September 2017 report that the permanency goal be changed to adoption.

Solis also authored a court report for the February 2018 permanency hearing. This report, dated January 17, 2018, was not included in the record, but it was admitted at trial. Solis testified that as of the date of that report, Mother had not had any visits with the children since November 3, 2017. The report noted that Mother was not completing urinalyses in Great Bend. What is more, Mother moved to Wichita at some point and then back to Great Bend, so Solis testified it became increasingly difficult to set up urinalysis services for Mother due to her transiency.

Robin Creiger, the KVC permanency supervisor on the case after Unfred left KVC, also testified at trial for the State. She testified about a court report she authored for the June 2018 review hearing and one she authored for the March 2019 termination hearing. These reports were not included in the record, but they were admitted at trial. As for the May 2018 report, Creiger testified that Mother had not been in contact with KVC since February or March 2018. She had trouble contacting Mother because KVC did not have a working phone number or address for her. She reported that Mother was not following through on anything, and as a result, Creiger recommended that a motion to terminate her parental rights be filed. As for the February 2019 report, Creiger testified

20

that Mother failed to complete a required urinalysis test at KVC on December 11, 2018. She also stated that Mother submitted to a court-ordered urinalysis on January 9, 2019, which came back positive for methamphetamine and amphetamine. Mother also submitted to a hair test on January 11, 2019, showing the same results. Creiger testified that these tests were concerning because by January 2019, the children had been in DCF custody for almost four years and Mother was still actively using illegal substances. Creiger once again recommended that Mother's parental rights be terminated.

Jose Acevedo, the KVC case manager from May 2018 through January 2019, also testified at trial about multiple reports he authored while working on the case—again these reports were not included in the record, but they were admitted at trial. In his report dated September 25, 2018, Acevedo testified that Mother had moved back to Topeka by that time. He told Mother she needed to be completing urinalysis tests, but Mother refused to do them at KVC because she reported she did not feel safe. Acevedo accommodated her by arranging to have the tests done at the YWCA. Mother failed to follow through with these accommodations. In another report Acevedo prepared on February 6, 2019, he expressed concern for Mother's continued drug use. He mentioned that she tested positive for methamphetamine following a court-ordered hair test on January 11, 2019. This alarmed him because at that time, Mother was on several medications, and he was concerned she was mixing methamphetamine with those medications. Acevedo also reported that Mother missed five total urinalysis tests in January 2019. He testified Mother disappeared on him and he recommended at that time to terminate her parental rights.

Dr. Hazel also testified about how he was concerned about Mother's self-reported substance abuse issues. He testified that Mother needed to address those issues and attend substance abuse recovery. Mother even testified that she used methamphetamine because she was traumatized about not having her children and not having any visits. She testified this triggered her PTSD, and she used methamphetamine to cope with the trauma.

When viewed in a light most favorable to the State, there is clear and convincing evidence that Mother's drug use throughout the life of the case impeded her ability to complete her case plan tasks. Specifically, her failure to submit to drug testing was a failure to complete that required case plan task, and it prevented her from having visits with her children. Thus, the district court correctly found that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(3).

4. *K.S.A. 2019 Supp. 38-2269(b)(4).*

A district court may find a parent unfit if there is clear and convincing evidence that the parent physically, mentally, emotionally, or sexually abused or neglected his or her child. K.S.A. 2019 Supp. 38-2269(b)(4).

The district court's finding on this point was merely conclusory. It did not expound further aside from making this statutory finding. Mother argues that the only evidence of abuse presented at trial was evidence that Father physically abused the children. She asserts the State presented insufficient evidence at trial as to this factor.

We have already found there was clear and convincing evidence to support a finding of unfitness under K.S.A. 2019 Supp. 38-2269(b)(2) because Mother left the children with Father despite knowing about his violent history toward T.D. Mother also asked her friend and her cousin to help Father care for the children, even though her friend used methamphetamine and her cousin failed a background check ordered by KVC. But other than this evidence supporting a finding of unfitness under K.S.A. 2019 Supp. 38-2269(b)(2), we are unable to find any separate clear and convincing evidence to support a finding of unfitness under K.S.A. 2019 Supp. 38-2269(b)(4). The State's brief addresses these two statutory subsections together without pointing to separate evidence supporting a finding of unfitness under each subsection. Thus, we conclude the district court erred in finding Mother unfit under K.S.A. 2019 Supp. 38-2269(b)(4).

22

*5. K.S.A. 2019 Supp. 38-2269(b)(7).*

A district court may find a parent unfit if there is clear and convincing evidence that an appropriate public or private agency made reasonable efforts to rehabilitate the family, but those efforts failed. K.S.A. 2019 Supp. 38-2269(b)(7).

The district court's finding on this point was merely conclusory. It did not expound further aside from making this statutory finding. Mother largely argues that KVC failed to help her complete case plan tasks once she decided to move to Great Bend. She also argues that she did provide required documentation to various case workers many times showing that she completed several case plan tasks. Yet she asserts none of these workers testified about receiving those documents.

But there is clear and convincing evidence to support the district court's finding as to this factor. Each worker who testified explained that they told Mother she needed to follow through with case plan tasks, including staying in contact with KVC, submitting to urinalysis tests when required, finding stable housing, attending therapy, and providing KVC proof that she was completing these tasks. Between 2016 and February 2020, the evidence established that Mother failed to follow through with many of these tasks. As noted above, she failed to stay in contact with KVC, she did not submit to drug testing, she did not attend therapy, and she did not provide any worker with documented proof that she was completing these tasks.

One major issue was Mother's transiency during the life of the case. Mother lived in Topeka when the case began, but she moved to Montara in February 2016 to live with her cousin, which is when Mother began struggling with her required case plan tasks. Mother was unable to attend visits with the children at this point because she did not have reliable transportation and relied on her cousin to take her when he was able. In June 2016, Mother moved to Great Bend because she testified her life had been threatened

23

while living in Montara. Specifically, Mother testified that she allowed homeless drug users to stay in her home during that time. These people would go out and use drugs, then they would come back to her house and get violent with one another. She testified that one of these people would use a knife to self-harm. When she tried asking these people to leave, one of them threatened her by holding a gun to her head. Mother refused to involve law enforcement and instead moved to Great Bend to get away from that ordeal.

When Mother moved to Great Bend, she relied on friends to transport her back to Topeka for drug testing and visits with the children. Mother complained throughout much of trial that KVC refused to provide her transportation, but it was KVC policy not to provide transportation for parents. While Mother lived in Great Bend, KVC workers set her up with an agency there so she could complete urinalysis tests under the case plan tasks, they provided her with gas cards at one point so that she could get to and from Topeka for visits and for psychological testing, and they tried to transfer venue to Barton County so that the case could proceed there and Mother could get additional services. When Barton County refused venue, the district court ordered DCF to appoint Mother a case manager in Great Bend to help her complete her case plan tasks. Yet Mother still failed to follow through with her case plan tasks despite having case workers from Great Bend and Topeka helping her. Mother also created added challenges when she moved from Great Bend to Wichita for a short time, only to move back to Great Bend.

Mother eventually moved back to Topeka in February 2018. At first, she moved from home to home, staying with multiple family members and friends. Then she resided at a battered women's shelter, and then she stayed at the Rescue Mission in Topeka. After she moved back to Topeka, there was testimony presented that Mother failed to stay in touch with KVC and continued failing to follow through with her case plan tasks. When Acevedo took over on the case, he testified that he tried accommodating Mother's requests to not have her urinalysis tests done at KVC. He set up a system where Mother could go to the YWCA to do these tests, but she never did so.

24

Time and again, case workers tried to help Mother complete her case plan tasks, but Mother simply refused to follow through with them. And the fact that she lived in several different locations over the five-year life of the case made it difficult for KVC to support Mother—this was largely because Mother failed to consistently stay in touch with the agency. As this court noted in *In re L.C.P.*, No. 118,841, 2018 WL 4039170, at *8 (Kan. App. 2018) (unpublished opinion), "agency action does not require an exhaustion of all resources or a 'herculean effort.'" The record establishes clear and convincing evidence that Mother failed to do her part to complete these tasks despite KVC's reasonable efforts to help her reintegrate the children. Thus, the district court correctly found that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(7).

### 6. *K.S.A. 2019 Supp. 38-2269(b)(8).*

A district court may find a parent unfit if there is clear and convincing evidence that a parent failed to adjust his or her circumstances, conduct, or conditions to meet his or her child's needs. K.S.A. 2019 Supp. 38-2269(b)(8).

Here, there is clear and convincing evidence that Mother failed to adjust her circumstances to meet the children's needs. The children were in foster care for almost five years at the time of trial—that is more than half of T.D.'s life and almost all of J.D.'s life. During that time, Mother failed to maintain safe and stable housing, having moved to several different locations, including staying with family and friends, and living in shelters. Mother continued using methamphetamine, which prevented her from having crucial visits with the children early in the case. When Mother was allowed visits, she would often fail to show up or call and cancel the visit—this led to very few visits with the children early on. Mother refused to address her mental health issues in any significant way. Mother failed to work on completing her case plan tasks so that she could reintegrate the children into her home. Mother failed to stay in consistent contact with the children, the foster parents, and KVC workers. As Dr. Hazel noted in his

testimony and as established by Mother's testimony, Mother always seemed to blame someone else for her lack of progress and her mental health issues impeded that progress because those issues made her believe that the agency workers were working against her.

In sum, Mother simply made no progress toward reintegrating the children into her home, instead blaming others for that lack of progress. This shows that even as of the date of the trial, Mother could not adjust her circumstances to meet her children's needs. Thus, the district court correctly found that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(8).

    *7. K.S.A. 2019 Supp. 38-2269(b)(9).*

A district court may find a parent unfit if there is clear and convincing evidence that a child has been in extended out of home placement as a result of the parent's actions and one or more of the factors in K.S.A. 2019 Supp. 38-2269(c) apply. K.S.A. 2019 Supp. 38-2269(b)(9).

Here, there is clear and convincing evidence to support the district court's finding as to this factor. As of the date of trial, the children had been in foster care for almost five straight years. They were originally removed from Mother's care because Father broke J.D.'s arm after Mother left the children with Father for a long time to go to Wichita despite knowing that Father had a violent history with T.D. As explained below, there are three factors in K.S.A. 2019 Supp. 38-2269(c) that apply in this case. Consequently, there was clear and convincing evidence to support the district court's finding as to this factor, and the court correctly found that Mother was unfit.

26

*8. K.S.A. 2019 Supp. 38-2269(c)(1).*

A district court may find a parent unfit if there is clear and convincing evidence that the child is not in the parent's custody and the parent failed to assure care of his or her child in the parental home when able to do so. K.S.A. 2019 Supp. 38-2269(c)(1).

As noted above, Mother was transient. The district court noted that Mother lived in at least seven locations all over the state of Kansas during the case. Mother often lived with friends and family or in shelters in these locations. When she lived in her own home in Montara, her cousin lived with her. Mother testified that a previous KVC worker informed her that her cousin failed a background check and that the worker was afraid of the cousin. Mother testified that this home was not a safe environment. She explained that she allowed transient drug users to stay at her home. These individuals often would go out and use drugs, come back to her place, and then get violent with one another or with themselves. Mother testified that the reason she had to leave her home and move to Great Bend is because one of these individuals threatened her with a gun after she asked that person to leave. This was not a safe or stable environment for T.D. or J.D.

Mother never had a stable home, and as Dr. Hazel and Amanda Roe, T.D. and J.D.'s therapist, testified, the children needed stability. When she did have her own home, she could not assure T.D. and J.D.'s safety in it—much less her own. There was clear and convincing evidence supporting the district court's finding that Mother was unfit under K.S.A. 2019 Supp. 38-2269(c)(1).

*9. K.S.A. 2019 Supp. 38-2269(c)(2).*

A district court may find a parent unfit if there is clear and convincing evidence that the child is not in the parent's custody and the parent failed to maintain regular

visitation, contact, or communication with the child or with the child's custodian. K.S.A. 2019 Supp. 38-2269(c)(2).

Once again, there is clear and convincing evidence to support the district court's finding as to this factor. Early in the case, Mother was inconsistent in attending visits with the children. Leesman testified that Mother would often fail to show up for a visit without calling or she would call and cancel. Then she would show up for a couple supervised visits and fail to show up for a while after that. Solis testified that KVC had to cancel two visits in July and September 2017. The July visit was cancelled because Mother tested positive for methamphetamine and was not allowed to see the children. The September visit was during Mother's parenting assessment with Dr. Hazel, and it was canceled because she was exhibiting erratic behaviors.

Mother also often refused or failed to show up to take required drug tests throughout the life of the case. To visit her children, Mother had to take a urinalysis test and be negative. Because she refused or failed to show up for these tests, Mother made it increasingly difficult to have visits with her children.

Mother's last visit with the children was on November 3, 2017. Given Mother's inconsistency visiting T.D. and J.D. before that point, the children's therapist testified that she observed that neither child had formed an emotional bond with Mother. In January 2018, Roe recommended that visits with Mother stop because it would be traumatic for the children given the fact that they could not remember her, they did not form an attachment with her, and they did not identify her as a biological parent.

There is also no indication that Mother ever tried contacting the children or the children's foster placement during the five-year life of the case. The State presented testimony from many KVC workers at trial that Mother barely kept in contact with KVC. When viewed in a light most favorable to the State, there was clear and convincing

28

evidence supporting the district court's finding that Mother was unfit under K.S.A. 2019 Supp. 38-2269(c)(2).

10. *K.S.A. 2019 Supp. 38-2269(c)(3).*

A district court may find a parent unfit if there is clear and convincing evidence that the child is not in the parent's custody and the parent failed to carry out a reasonable court-approved plan to reintegrate the child into his or her home. K.S.A. 2019 Supp. 38-2269(c)(3).

Given the above analysis, Mother failed to follow through with her required case plan tasks, including, but not limited to:  finding safe and stable housing, attending therapy to address her mental health issues, attending domestic violence therapy, submitting to random drug tests when requested, attending visits with the children, staying in contact with KVC, and providing proof or documentation showing Mother completed these tasks. There was thus clear and convincing evidence supporting the district court's finding that Mother was unfit under K.S.A. 2019 Supp. 38-2269(c)(3).

To sum up the findings on parental unfitness, we disagree with the district court's finding that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(4). But we agree with the district court's findings of unfitness under the remaining statutory subsections. As stated earlier, any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f). Thus, we conclude there was clear and convincing evidence to support the district court's finding that Mother was unfit by reason of conduct or condition which renders her unable to properly care for T.D. and J.D.

29

*Findings on foreseeable future*

Mother next argues that the district court erred in finding that her unfitness was unlikely to change in the foreseeable future. She specifically challenges the district court's four findings on this point: (1) Mother's consistent trauma and drama in her life, (2) Mother's transiency, (3) Mother's substance abuse issues, and (4) Mother's unaddressed mental health issues. She also asserts that she could not change her circumstances because of the delays caused by the judicial process. She claims the two default judgments that were originally entered against her prevented her from really working with the agency to complete her case plan tasks.

There must be clear and convincing evidence to support a district court's finding that the conduct or condition rendering a parent unfit is unlikely to change in the foreseeable future. This court examines the term "foreseeable future" from the perspective of a child. Children and adults have different perceptions of time, and a child has the right to permanency within a time frame reasonable to them. A district court may look to a parent's past conduct as an indicator of future behavior. *In re K.L.B.*, 56 Kan. App. 2d at 446-47.

The evidence presented at the termination hearing established that Mother's unfitness was unlikely to change in the foreseeable future. Simply put, there was clear and convincing evidence supporting the district court's four specific findings. In the four-to five-year life of the case, Mother consistently seemed to find herself in dangerous situations. At the case's inception, she was trying to leave Father and the domestic violence issues she suffered with him. After the children were removed, she moved to Montara where she lived with transient drug users, one of whom threatened to kill Mother. Because of that, Mother had to move to Great Bend. Mother only moved back to Topeka two years later when she believed she felt safe to do so. Shortly after she moved back to Topeka, Mother testified that she was robbed and had all her possessions stolen

30

from her. As late as January 2020, Mother stated she was in the hospital after getting beaten up. Agency workers and Dr. Hazel testified that they were concerned about Mother's decision-making skills and her ability to ensure her children's safety. This condition did not change throughout the case.

Mother also could not provide safe and stable housing for herself or her children throughout the case. She moved to at least seven locations across the state of Kansas during the proceedings. Many of these locations were either unsafe, temporary, or not suitable for the children. As of the trial date, Mother was still living in a shelter in Emporia and would not be moving into a home until March 2020. Given Mother's extensive history of transiency throughout the case, there was no guarantee that this condition would change in the foreseeable future.

Throughout the case, Mother also consistently failed to address her substance abuse and mental health issues. Not only were these required case plan tasks, but these were requirements Mother needed to abide by before she could visit with the children and work toward reintegrating with them. Over this five-year period, Mother often refused to address these issues, including missing multiple urinalysis tests, testing positive for methamphetamine after taking court-ordered tests, missing visitation with the children, refusing to seek out therapy, and refusing to follow through with psychological and substance abuse evaluation recommendations. Given this history, there was once again no indication that Mother's condition would change in the foreseeable future.

Mother points to the fact that at the time of trial, Mother had found stable housing, was seeing a therapist, and was abstaining from using drugs. While this may be true, Mother did not decide to make these major changes until the February 2020 termination trial. But by that time, the children had been in DCF custody for almost five years—over half of T.D.'s life and almost all of J.D.'s life—and the damage to the children had been done. Neither child knew who Mother was and the children could not form any emotional

31

attachment with her. Even the children's therapist suggested that it would be traumatic for the children to have continued visits and contact with Mother.

Mother's past behavior throughout this case is a strong indicator of her future behavior. Because she could not correct these behaviors in the five years the case was pending, because the children had been in DCF custody for most of their lives, and because the children did not form any emotional bond with Mother, the district court correctly found that Mother's unfitness was unlikely to change in the foreseeable future.

*Best interests finding*

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

The decision that termination of parental rights is in the best interests of the child rests within the district court's sound discretion. As such, the appellate courts review these determinations for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A judicial action constitutes an abuse of discretion if: (1) no reasonable person would take the view adopted by the trial court, (2) it is based on an error of law, or (3) it is based on an error of fact. *In re M.S.*, 56 Kan. App. 2d 1247, 1255, 447 P.3d 994 (2019).

Mother argues that the district court abused its discretion in finding that termination of her parental rights was in the best interests of her children because the court only focused on how long it took the children to achieve permanency. She asserts that she was never given the opportunity to work on her relationship with her children

because the children's therapist found that the children were in a more stable environment with their foster parents and that visits with Mother should no longer occur. Essentially, Mother claims that the foster family was given more preference, therefore putting Mother at a disadvantage in repairing her relationship with T.D. and J.D.

Here, the district court did not abuse its discretion in terminating Mother's parental rights. Mother largely ignores the fact that she had plenty of opportunity early in the case to follow the required case plan tasks, including staying clean so that she could attend visits with the children. As T.D. was three years old and J.D. was three months old when they were taken into custody, it was crucial for Mother to abide by the case plan so that she could visit with the children and form the needed emotional attachment with them. Instead, Mother often refused to take drug tests, which were required before she could visit the children. She was inconsistent about visiting the children—sometimes she would not show up or contact anyone beforehand, sometimes she called to cancel, and other times visits had to be cancelled because she failed a drug test or was acting erratically.

As Roe testified, this lack of consistent visitation made it so that the children could not form an emotional attachment to Mother. T.D. reported knowing who Mother was and understanding she had lived with Mother before, but she did not have any conscious memories of who Mother was and did not identify Mother as her biological parent. After T.D.'s limited visits with Mother early in the case, the foster parents and Roe reported that T.D. acted out, exhibiting more aggressive and defiant behaviors. T.D. started understanding that she was a foster child and that her permanency was not guaranteed. Roe testified that this was traumatic for T.D. because she did not know who her Mother was, did not have an emotional attachment to her, and became confused about her permanency status every time she had contact with Mother. Roe also reported that J.D. also had no idea who Mother was and did not identify her as being his biological parent. Roe testified that it would be traumatic for the children to be sent back to live with Mother, a person to whom they had no attachment or emotional bond.

33

Evidence was also presented that the children were thriving in their foster care placement. The foster parents could provide for the children's mental health, medical, and educational needs, and they could provide a stable home environment. T.D. was doing better with her boundaries, such as asking for and giving hugs. She was progressing in therapy, and she was on an appropriate medication regimen to stabilize her moods and help with her ADHD. She was also improving in school because the foster parents helped get her an individualized education plan and speech therapy services. Both children were forming appropriate bonds with their foster family.

Given the weight of the evidence presented at the hearing, the clear progress the children made in therapy and while in their foster parents' care, the children's lack of an emotional attachment to Mother, and the fact that the children would be traumatized if returned to Mother, a reasonable person would agree that it was in the children's best interests to terminate Mother's parental rights. And as Mother does not allege any factual or legal mistakes by the district court, the court did not abuse its discretion in finding that termination of parental rights was in the best interests of the children.

Affirmed.